The judgment of the United States Customs Court is *reversed*.

United States *v.* Heemsoth-Kerner Corp. (Bauer Type Foundry, Inc.) (No. 4422)[1]

[1] C. A. D. 252.

United States Court of Customs and Patent Appeals, July 15, 1943

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney, of counsel), for the United States.
*Benjamin A. Levett* for appellee.

[Oral argument April 7, 1943, by Mr. Auster and Mr. Levett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges [2]

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, Third Division, affirming the judgment of a single judge in a reappraisement proceeding. The merchandise involved is printing type imported from Germany during the month of January 1938, entered at the port of New York for the Bauer Type Foundry, Inc. (the actual party in interest hereinafter referred to as appellee) by Heemsoth-Kerner Corporation, a customs brokerage company employed by appellee.

It appears that the type was purchased from a German concern (Bauersche Giesserei); that appellee was the sole and exclusive importer of such type; that it was bought in fonts and invoiced in kilos in reichsmarks currency.

[2] Lenroot, Judge, took no part in the consideration or decision of this case.

It is explained that the term "font," as used in connection with the merchandise, means an assortment of type of one size and style, including a due proportion of all letters in the alphabet and punctuation marks.

The merchandise was appraised by the local appraiser on the basis of United States value, in units of fonts, the value being expressed in terms of United States currency. Upon appeal by the importer for reappraisement the single judge held that the United States market was a controlled market and that there was no United States value, as defined in section 402(e) of the Tariff Act of 1930. He further held that the proper dutiable basis was cost of production as defined in section 402(f) of the act.

It was conceded that there was no statutory foreign or export value for the merchandise.

The pertinent provisions of section 402(e) and 402(f) read:

SEC. 402. VALUE.

   *      *      *      *      *      *      *

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

    (1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

    (2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

    (3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

    (4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

In its brief before us the Government states, in substance, that the questions for our determination are (1) whether the merchandise is

dutiable on the basis of United States value as held by the local appraiser (the Government contending that it is) and (2) whether (if we agree with the holding that cost of production is the proper basis) the addition for profit required by section 402 (f) was correctly determined below.

In connection with the appeal to us numerous allegations of error are assigned and the Government's brief devotes considerable space to a discussion of the testimony and other evidence in the case, seemingly in the effort to show, in some instances, lack of any substantial evidence to support certain findings of fact, but, in most instances, for the purpose of arguing that correct conclusions of law were not arrived at by the respective tribunals of the Customs Court.

It must be remembered that in our review of reappraisement proceedings we are limited by the statute to the consideration of questions of law. The only question which we may consider in connection with a finding of fact is whether there is any substantial evidence to support the finding. We state that familiar principle of law here because some of the Government's assignments of error seem to us to have been drawn in an effort to have us weigh the evidence, and this we are not at liberty to do. We first consider the question of United States value.

The single judge who tried this case in the first instance reviewed the evidence comprehensively and made findings of fact as follows:

1. That the Bauer Type Foundry, Inc., is the sole importer and agent in the United States for the printing type constituting the merchandise at bar.

2. That said Bauer Type Foundry, Inc., sells such type to certain so-called distributors or dealers appointed by it.

3. That said Bauer Type Foundry, Inc., binds itself not to permit its type to be sold by any other person in the respective territory of each distributor.

4. That said distributors or dealers sell the said type in their allotted territories only to consumers at the said retail prices fixed by the Bauer Type Foundry, Inc.

5. That in certain sections of the United States outside of the territories allotted to its distributors, the Bauer Type Foundry, Inc., appoints agents who are given the privilege of selling said type in certain specified areas only at the prices fixed by said Bauer Type Foundry, Inc., the agents receiving certain commissions therefor.

6. That the only type sold by the Bauer Type Foundry, Inc., for resale is that sold to the said distributors, 13 in number, no one of whom may sell to any purchaser outside his respective territory.

The appellate division (which is clothed with authority to weigh evidence and itself find facts) stated that it was "substantially in agreement" with the findings of fact and the conclusion of the trial judge and added:

In our consideration of the evidence we find it pertinent and essential to enlarge upon some of the facts contained in the record. Exhibit 2 consists of a book of orders for the month of January 1938. It contains all of the transactions entered into by the importer during the period of exportation of the instant merchandise,

including the sale of printing type in units of "fonts." The Government is not in agreement with the importer's analysis of such sales as set out in collective exhibits A and A-1, considered by the trial court. A careful tabulation by this court of the order sheets contained in exhibit 2 discloses:

First, that there were 841 of such orders involving 828 sales of merchandise, 15 thereof not being printing type; that out of the 813 sales 798 were made throughout the United States and 15 in Canada; that shipment thereof was made from the importer's place of business in New York City and the shipping expenses with few exceptions were charged to the purchasers.

Second, that 536 of said sales were made to consumers in the city of New York at list prices plus 2 per centum tax (in New York City a 2 per centum sales tax is placed upon all retail sales); that 8 additional sales were made in New York City at list prices, no tax being added, making a total of 544 sales at the importer's retail list prices.

Third, that 5 sales were made in New York City to two firms, to wit, Damon & Peets, and Zimmer Printers' Supply, upon which discounts of 20 per centum and 25 per centum respectively were allowed from the list prices.

Fourth, that 99 sales were made at list prices throughout the United States, including 24 sales in New York State; that these sales were made in 23 states; that in 3 of these sales two dealers received the credit and in 32 sales the agents in various territories received credit; that the order sheets failed to note as to the remainder of these sales whether or not credit was given to agents or distributors, although 22 sales were made in territories of distributors and 4 sales in the territory of the St. Louis agent.

Fifth, that 51 sales were made to one distributor at list prices less 30 per centum discount and 95 sales were made to ten distributors in territories throughout the United States who received discounts from list prices of 25 per centum.

Sixth, that 4 sales were made at list prices less 20 per centum discount, to wit, 1 each to E. C. Palmer, New Orleans; Bush-Krebs Co., Louisville, Ky.; Bladen-Mathewson Co., Washington, D. C.; and Kelsey Press, Meriden, Conn.

Seventh, that out of the 15 sales to Canadian firms, three received "trade discounts" from the list prices of 25 per centum upon a total of 8 sales; that one firm, Cornish & Wimpenny, received a 10 per centum "trade discount" upon their first order during January and 20 per centum "trade discount" upon their second order; and that there were five firms to each of whom 1 sale was consummated at the importer's retail list prices, although it is noted that sales to two of these firms were credited to the Universal Book Mart at 20 per centum and the sale to one other firm was credited to the Toronto Type Foundry. The actual sales record for the month of January shows, therefore, that the importer made 643 sales to consumers or users throughout the United States and 146 sales to distributors; that in the United States at least 8 sales were made at list prices less discounts to purchasers who were not distributors or agents and 1 sale was made to an agent at a 20 per centum discount; and that in Canada 5 sales were made at list prices and 10 sales were made at list prices less "trade discounts."

Upon the basis of the foregoing findings of fact the appellate division stated its conclusion respecting United States value as follows:

In view of the importer's uncontradicted testimony that in the ordinary course of business sales are made by the importer either directly or through agents to consumers or users at net prices fixed in the retail price list, or by the importer to certain specified distributors for resale to consumers or users in their respective territories at fixed net prices, we are of the opinion that such sales were not consummated at freely offered prices, packed ready for delivery in the principal

market of the United States to *all* purchasers at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade. It might be stressed here that there is but one market in the United States for this class of merchandise, and in such market the importer offers the goods first, to a specified trade, to wit, consumers or users, at fixed prices, and second, to distributors specially selected by the importer, who are obliged to sell within specified districts at prices fixed by the importer to consumers or users only and that the price to distributors is granted solely upon condition of resale to users. The control as to use of the merchandise by the distributors may be illustrated by one of the order sheets appearing in exhibit 2, of Mackenzie & Harris, Inc., of San Francisco, a distributor. There it is shown that 5 orders of printing type amounting to $20.75 were used in the distributor's own shop. The importer billed the distributor for $5.18 additional, noting thereon the following: "25% additional for type used in your own shop." In our opinion it is apparent that the merchandise was not freely offered for sale in the United States to all purchasers, inasmuch as it was restricted and controlled in respect to sales to distributors. Even if the sales to consumers or users were regarded as unrestricted when part of the market was restricted, the market becomes restricted and controlled under the law. We are also of the opinion that the 9 sales made by the importer in the United States and the 10 sales in Canada at list prices less discounts or "trade discounts" will not alter the prevailing condition of a restricted market. [Italics quoted.]

In support of the conclusion so stated the appellate division cited certain cases to which we shall later refer.

We are of opinion that each of the findings of fact above quoted is supported by substantial evidence, and so far as any of the assignments of error before us may be construed as alleging the contrary they are overruled.

The question is, therefore, whether upon the basis of the facts so found the correct conclusion of law was reached.

The contention of the Government that there is statutory United States value appears to be based principally upon the fact (as found by the appellate division) that appellee made numerous sales of fonts of type directly to consumers in New York City at list prices, in which sales appellee's distributors and agents did not participate.

The Government claims that New York City was the principal market of the United States for the involved merchandise. The appellate division (without naming the place) found that only one market existed and obviously it must have had New York City in mind. So, we assume that the Government's claim in that respect is correct.

The Government also contends that, upon the record, it should be held that "the usual wholesale quantity, whether to dealers, agents, or consumers, was in the quantity of one font per size and style."

Neither the trial court nor the appellate division made any finding as to usual wholesale quantity, obviously because it was unnecessary under their theory as to the law of the case. We may assume for the purposes of this decision that one font does constitute the usual wholesale quantity, but we do not regard that as a material matter here.

As we understand the contention of the Government, it is that anyone, whether distributor or consumer, might·have purchased the type (as some consumers did) in the principal market of the United States at the list prices and hence that it was freely offered to all purchasers within the meaning of section 402 (e), *supra.*

We are unable to agree that upon the facts as found below, the Government correctly states .the applicable rule of law. That the market was restricted and controlled in respect to distributors both as to price and territory admits of no doubt. The appellee itself is bound not to permit sales in a territory where it has a distributor by any person other than the distributor, except in an .emergency, and the retail price at which the distributors may sell is fixed by appellee. As for the sales by agents they are, in legal effect, sales by appellee. Appellee itself sells no type for resale, except that sold to the distributors, and if a distributor takes for its own use some of that which.it purchases, it must pay the list price for it, without discount.

So, while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States, it is not freely offered for sale by appellee at such list .prices in such principal market to·purchasers in territories allotted to distributors, which territories cover a major portion of the United States. Therefore, it may not be held that it is freely offered for sale in the principal market to all purchasers in the ordinary course of the trade within the meaning of section 402 (e), *supra.* Accordingly, the issues in this case are distinguishable from those decided in the case of *Innis, Speiden & Co.* v. *United States,* 19 C. C. P. A. (Customs) 1, T. D. 44789, here relied upon by the Government.

· We are of opinion that as to the question of United States value the case falls within the principle of the decisions in *Half Moon Manufacturing & Trading Co., Inc.* v. *United States,* Reap. Dec. 4314, 73 Treas. Dec. 1560; *Goodyear Tire & Rubber Co.* v. *United States,* 11 Ct. Cust. Appls. 351, T. D. 39158, and *United States* v. *International Forwarding Co.,* 13 Ct. Cust. Appls. 579, T. D. 41436.

The second question in the case involves the correctness of the finding below relating to cost of production as defined in section 402 (f), *supra.* Specifically, the Government's contention is confined to the "addition for profit," provided in the fourth paragraph of the section, and is based largely upon the use of the word "average" in the respective decisions.

The trial judge based his finding upon an affidavit of the managing director of the foreign manufacturer introduced in evidence as Exhibit 1. We deem it proper to quote the following from the affidavit:

Affiant further states that the net profit made by his house on the various type naturally varies according to the style of type and according to the quantities sold; that due to the fact that his house makes and handles something like 800 or more various types it is impossible to give the exact net profit as to each item;

but affiant states that as shown by his books the average net profit on such types has been for the past five years, respectively, 1938, 9%; 1937, 10%; 1936, 8%; 1935, 8%; 1934, 8%.

Affiant further states that by reason of his familiarity with the trade in Germany as to the manufacture and sale of printing type of the class here in question, he can state of his own knowledge, and does so state, that the average profit made by his house represents the usual profit made by manufacturers in Germany in selling this class of merchandise.

We also quote the following from the decision of the trial judge:

In the said affidavit the affiant's statement that, inasmuch as his company manufactures 800 or more various styles of type, it is impossible to ascertain the net profit as to each class of type herein, is readily understandable. It would be equally understandable that a manufacturer of a great variety of screws, bolts, nuts, etc., may find it difficult, or at least impracticable, to determine the net profit accruing on each size of screw, bolt, or nut made.

I am, therefore, taking the uncontradicted evidence contained in the affidavit as to the cost of material, fabrication, general expenses and packing of each particular class of type involved herein, and adding thereto the profit of the manufacturer for the year 1937, which is 10 per centum. Inasmuch as said merchandise was exported in January 1938, I am satisfied that the profit fairly applicable in computing the cost of production is that which accrued during the year 1937 rather than during 1938.

During the course of the trial there was introduced in evidence as Exhibit 7 a report of an assistant Treasury attaché in Germany. The trial judge held it to be of "little or no probative value," because "it appears to deal only with foreign and export values," and the brief on behalf of the Government before us states that it "does not alter the pertinent facts nor assist in determining the issue as presented."

The appellate division, however, gave it consideration in connection with the issue, saying:

Although the trial court was of the opinion that defendant's exhibit 7, the report of an assistant Treasury attaché in Germany, was of little probative value, we find that said report discloses that the type sold in the home market was not identically the same as that shipped to the United States, being of heavier body and of different size, but that all of the type manufactured is from the same raw material whether it is intended for use in Germany or for export and that the cost of production of the exported type is substantially the same as that made for the home market, as the difference in the size and weight of the type bodies is too small to be of any significance in a comparison of the production cost of the finished type. The evidence produced by the Government, therefore, corroborates evidence of importer that the printing type manufactured for home consumption is of the same general character as printing type manufactured for export to other countries including the United States.

The appellate division then pointed out (citing the cases of *United States* v. *Henry Maier*, 21 C. C. P. A. (Customs) 41, T. D. 46378, and *United States* v. *T. E. Ash et al.*, 23 C. C. P. A. (Customs) 360, T. D. 48211) that "It is well settled that the item of profit under section 402 (f) is to be derived from profit made by the manufacturers upon merchandise of the same general character as the imported merchandise," and continued:

In view of the evidence presented and the decisions cited we hold the evidence as to profit sufficient within the provisions of the law. Inasmuch as the type in question was shipped in January, 1938, we approve the adoption by the trial court of the average profit for the year 1937 as the profit to be added as an element of the cost of production herein.

It seems to us that a fair construction of the decisions of the respective tribunals of the Customs Court when considered in their entirety indicates that the word "average" may have been used inadvertently.

If the record disclosed nothing more than the average profit made by the manufacturer of the involved merchandise, as stated in the first paragraph hereinbefore quoted from the affidavit, Exhibit 1, we would be unable to agree to the conclusion of the appellate division on this phase of the case, because such average profit might be wholly different from the profit made on the instant merchandise. However, it is said in the second paragraph quoted from the affidavit that the usual profit made by other manufacturers in Germany of merchandise of the same general character as that here in question was the same as the average profit made by the manufacturer of the instant merchandise.

We must assume that the appellate division took the facts stated in the second paragraph into consideration, and for that reason found that the profit ordinarily made by German manufacturers of merchandise of the same general character as that here involved equaled, or was the same, as the average profit made by affiant's company—that is 10 per centum as found. We think there is substantial evidence to support the finding and judgment of the appellate division.

The judgment is *affirmed*.